UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NORTH CAROLINA
RALEIGH DIVISION

FILED

MAR 3 1 2006

PEGGY B. DEANS, CLERK
U.S. BANKRUPCY COURT
EASTERN DISTRICT OF N.C.

IN RE:                                    CASE NO.

HESTER ALICE DAVIS                        04-03619-5-ATS

    DEBTOR


HESTER ALICE DAVIS                        ADVERSARY PROCEEDING NO.

    Plaintiff                             S-05-00076-5-AP

    v.

MILLENNIUM DEVELOPMENT GROUP, LLC
and LEWIS A. THOMPSON, III

    Defendants.


**MEMORANDUM OPINION AND ORDER DENYING MOTION FOR RELIEF FROM STAY,
ORDER DENYING OBJECTION TO CONFIRMATION OF PLAN AND
ORDER ALLOWING OBJECTION TO CLAIM**

The trial of this adversary proceeding brought by the chapter 13 debtor, Hester Alice Davis, against defendant Millennium Development Group, LLC for claims of breach of contract, breach of express and implied warranties, violations of the North Carolina Manufactured Home Warranties Act, unfair and deceptive trade practices, misrepresentation, negligence, and violation of the North Carolina Fair Debt Collection Practices Act, and against defendant Lewis A. Thompson, III for breach of his fiduciary duty as trustee under a deed of trust, was held in Raleigh, North Carolina on February 9, 10, and 13, 2006. For the reasons that

follow, judgment will be entered in favor of the plaintiff against both defendants.

Hester Alice Davis filed a petition for relief under chapter 13 of the Bankruptcy Code on October 6, 2004, to stop foreclosure proceedings against her real property. She filed this adversary proceeding on April 4, 2005, against Millennium, which was seeking to foreclose, and on April 12, 2005, she added Mr. Thompson as a defendant in his capacity as trustee under the deed of trust. The court denied Mr. Thompson's motions to dismiss and for summary judgment on August 25, 2005, and January 12, 2006, respectively.

Millennium filed a proof of claim, and on February 8, 2005, Ms. Davis filed an objection. On March 2, 2005, Millennium also filed a motion for relief from the automatic stay and an objection to confirmation of the debtor's chapter 13 plan. This memorandum opinion addresses the issues raised in the complaint, the debtor's objection to Millennium's claim, and Millennium's motion for relief from the automatic stay and objection to confirmation.

### JURISDICTION

This bankruptcy court has jurisdiction over the parties and the subject matter of this proceeding pursuant to 28 U.S.C. §§ 151, 157, and 1334, and the General Order of Reference entered by the United States District Court for the Eastern District of North Carolina on August 3, 1984. This is a "core proceeding" within the meaning of 28 U.S.C. §§ 157(b)(2)(B), (C), (G), (K) and (O), which this court may hear and determine. To the extent that there are

2

matters raised in this adversary proceeding that are not core proceedings, those matters are related proceedings which the parties have agreed may be heard and determined by this bankruptcy court.

### FACTS

Ms. Davis owns a parcel of land in Warren County, North Carolina. In 2002, she spoke with several modular home manufacturers about adding a house to her land, and in December 2002 or January 2003, she approached Millennium about buying such a home. Ms. Davis met with Larry Davis, a part owner of Millennium, and an agreement was reached for Millennium to procure and install a custom modular home for Ms. Davis at a cash purchase price of $125,912. On February 7, 2003, Ms. Davis and Millennium executed a Contract to Purchase and Deposit Agreement ("purchase contract"), Pl. Ex. 2, which set forth the terms of their agreement. The specifications for the modular home and the additional construction work to be performed by Millennium were set forth in two other documents titled "Proposal," Pl. Ex. 4, and "Construction Quote," Pl. Ex. 3.

Ms. Davis worked with Dick Hutchins of Premier Mortgage Corporation to obtain financing for the home and she was approved for an FHA refinancing loan. The exact terms of the loan, including interest rate, amount of monthly payments, and the duration of loan, have not been established. Sometime after the purchase contract was signed, Mr. Hutchins notified Mr. Davis of the loan commitment and explained that the FHA loan would be used

to pay the construction loan.  The agreement between Ms. Davis and Millennium, however, did not contemplate or provide for a construction loan.  Not to be deterred, Mr. Davis was willing to proceed with the transaction, but required Ms. Davis to sign a promissory note in the amount of the $125,912 purchase price and to secure the promissory note with a deed of trust on her real property.

Mr. Davis, with the consent of Ms. Davis, hired defendant Lewis A. Thompson, III to prepare a promissory note and a deed of trust.  The documents that were prepared by Mr. Thompson's office in mid-March 2003 contain a number of inconsistencies and errors.  The promissory note is dated March 12, 2003, and states that it is "secured by a deed of trust of even date herewith."  Pl. Ex. 6.  However, the deed of trust is dated March 12, 2002, rather than March 12, 2003.  Pl. Ex. 7.  The note states that it is due "In one lump sum due September 12, 2004, or upon closing of construction loan, which ever occurs first."  Pl. Ex. 6.  Mr. Davis testified that there never was to be a construction loan and that the reference to September 12, 2004, should have been to September 12, 2003.

More significant than these errors is the fact that the note and deed of trust are inconsistent with the transaction agreed to by Ms. Davis and Millennium as described in the Contract to Purchase and Deposit Agreement.  Pl. Ex. 2.  The purchase contract, in the sixth paragraph on page 2, refers to a deed of trust that will secure the "cost of the Land Improvements and all costs

4

incurred in connection with delivery and set-up of the Home," but the first page of the contract indicates that there is no charge for Land Improvements and there are no itemized delivery costs. Paragraph 6 of page 2 of the purchase contract also provides that a deed of trust shall secure a Deposit Note. The first page of the purchase contract indicates that a Deposit Note is "N/A," which the court finds to mean that a Deposit Note is "not applicable." There is no other mention in the purchase contract of a note and deed of trust.

The note and the deed of trust were apparently prepared without a review of the purchase contract and without an understanding of the basic sale transaction between Ms. Davis and Millennium. Although Mr. Davis may have thought that the deed of trust, which according to the notary's certification was executed by Ms. Davis on March 17, 2003, secured the purchase price of the home, that interpretation is inconsistent with the terms of the purchase contract. Mr. Davis knew of the errors in the documents and made no attempt to correct them. Clearly, nothing was owed by Ms. Davis to Millennium when the promissory note was executed, and there is no provision in the deed of trust that provides that the deed of trust is to secure future advances. Mr. Davis testified that nothing was owed by Ms. Davis until there was a closing. There never was a closing because Ms. Davis never accepted the home. Accordingly, the court finds that no amount was ever due under the promissory note, and no amount was secured by the deed of trust.

Mr. Davis knew that the purchase price of the home was to be financed by the FHA loan, and he worked with Mr. Hutchins to meet FHA's requirements.  He supplied the necessary documentation to Mr. Hutchins and performed additional work that FHA required, including landscaping, a water test, a land plat, driveway work, and a full list of materials.  These work items were outside the original contract terms, and Mr. Davis testified that he spoke with both Ms. Davis and Mr. Hutchins about the extra cost.

Mr. Davis ordered the modular home from the manufacturer in July 2003, and the home was completed by the manufacturer in August.  Millennium hired Joe Lewis & Sons to pick up the home and store it until Ms. Davis' lot was ready for the home to be installed.  After an existing mobile home was removed from the property and the foundation was laid and inspected, the modular home was delivered on September 16, 2003.  Millennium's subcontractors finished the "dry-in" (including the roof and gable-end walls) of the home, but on September 18, high winds from Tropical Storm Isabel blew out one of the home's gable ends.

On September 19, Ms. Davis informed Mr. Davis that one of the gable ends had blown out.  Mr. Davis went to the property and found that the gable end panel on the north end of the house was on the ground. The storm had passed, but because of downed trees blocking the roads, no one could get to the house to cover or repair it. Mr. Davis testified that the weather was sunny and dry through Monday after the storm, and that Millennium's subcontractor went to the house on Monday to inspect and to repair the damage.   The

6

subcontractor reported to Mr. Davis that a small amount of insulation was wet, and Mr. Davis directed the subcontractor to remove and replace the wet insulation, which the subcontractor did that day.

Following the storm, the subcontractor continued to work on the installation of the house, and Mr. Davis returned to the site in mid-October while punch list and touch-up work was being completed. Mr. Davis inspected the repaired gable and looked in the attic where the insulation had gotten wet. He asked the subcontractor about structural damage and crawled under the house. According to Mr. Davis, he did not see anything out of the ordinary, and he was satisfied that the house was in good condition and would soon be completed and ready for occupancy.

Ms. Davis had an entirely different view of the construction process and of the storm damage. On October 8, 2003, she wrote a letter to Mr. Davis advising him that she did not believe the damage from the storm had been properly repaired. Pl. Ex. 11. The letter stated that the insulation in the attic was still wet and was covered with debris such as leaves, sticks, and limbs. Sheetrock was beginning to mildew, and Ms. Davis was concerned that other walls would later mildew as well. Ms. Davis indicated that she expected Millennium to make a claim on its insurance to cover this damage. Ms. Davis also itemized a number of other complaints, including cracks in the walls, a plant shelf that differed from what Ms. Davis thought she ordered, a problem with the seams in the

kitchen countertops, a change in porch railings, a missing frost-free faucet, and incorrectly installed lights and shelves.

On October 22, 2003, Ms. Davis wrote another letter to Millennium, reiterating her concerns with the storm damage and her belief that the home had not been repaired. Pl. Ex. 12. Ms. Davis requested that the insulation that had gotten wet be removed and that the ceilings and walls that had gotten wet be replaced. She again requested that Millennium make an insurance claim to repair the damages, and requested that the county building inspector inspect the home to verify there is no health risk and that the house meets all building codes. Ms. Davis again listed other items needing to be corrected, including the same items listed in the letter of October 8, 2003, dissatisfaction with the landscaping, a request that Millennium move a large storage building to the back of the lot and a claim for reimbursement for moving a small storage building.

Mr. Davis responded to both letters on October 29, 2003. Pl. Ex. 13. With respect to the storm damage, Mr. Davis wrote that the wet insulation had been replaced, the gable panel was reinstalled, and the damaged framing was repaired on the Monday after the storm. There was also some water damage to the ceiling drywall and under the window in the master bedroom, which had been replaced and/or repaired. Because the damage was less than $150, he maintained that there was no need to make an insurance claim. Mr. Davis also indicated that all inspections were completed and a certificate of occupancy had been issued.

8

Mr. Davis then addressed the listed items in both letters, indicating that several of the items were constructed as provided in the contract (plant ledge, countertops), several were not required by the contract (landscaping, more than one frost-free faucet, moving buildings), and others were the subject of change orders that Ms. Davis had never signed.  Mr. Davis noted, with respect to another of Ms. Davis' contentions relating to electric lines, that it would have been very expensive to bury the power lines, and that the cost would have been borne by Ms. Davis. Further, Mr. Davis said that Millennium has no control over the electrical service.  With respect to the porch rails, Millennium tried to accommodate Ms. Davis's request for wood rails during installation, even though the contract provided for the rails to be iron.

Finally, Mr. Davis indicated that he made several attempts to work with Ms. Davis to accommodate changes required by the FHA to close the loan, but he had great difficulty reaching Ms. Davis. Some of the work was done without signed work orders to facilitate closing.  According to Mr. Davis, Millennium was ready to do a walk through of the house.

Mr. Davis testified that Ms. Davis did not contact Millennium in response to the letter of October 29, 2003.  Millennium continued construction and hired an additional inspector, Tim Wiggins, on October 27, 2003.  Mr. Wiggins advised Millennium that there were no problems with the house to prevent closing.  Mil. Ex. 1.

Meanwhile, Mr. Hutchins tried to reach Ms. Davis to learn the name of her closing attorney.  Based on his discussions with Mr. Davis, Mr. Hutchins anticipated a November 2003 closing.  FHA requires an appraisal, and Mr. Hutchins requested a final appraisal from C. Kirk Reilly.  Mr. Reilly appraised the property on September 30, 2003, Mil. Ex. 5, and issued his final report on January 9, 2004.  Mr. Hutchins testified that the FHA requirements had been met and he was ready to close the loan in November 2003.

Mr. Davis was frustrated by his inability to reach Ms. Davis, and he was concerned that Ms. Davis was not planning to close the purchase of the home.  At this point Millennium, which was a small company that had most of its limited capital tied up in the purchase of the modular home, was eager for the sale to close, and Mr. Davis contacted Merle Hendricks, another Millennium shareholder, to review Millennium's options.

In November 2003, Millennium decided that it would pursue foreclosure of the deed of trust.  Mr. Davis contacted Mr. Thompson, the trustee under the deed of trust, to advise him that Ms. Davis was not acting in good faith to close the loan, and that Mr. Davis considered her failure to close to be a default.  Mr. Thompson informed Mr. Davis that Millennium needed to notify Ms. Davis in writing of the default, and once he had evidence that it had been done, he would proceed with foreclosure.

Mr. Davis, who had never been involved in a transaction as a lender, had never been involved with a foreclosure, and who had no legal training, sent Ms. Davis a letter dated November 14, 2003.

The letter, which appears to be a standard default letter, stated "In that you are in default in your note payments and we have had no contact from you, please be advised that the undersigned holder of the note elects to accelerate the maturity of your loan."  Pl. Ex. 14.  The letter further states that "Pursuant to North Carolina General Statute 45-21.16(c) as amended, we are notifying you that we propose to commence a foreclosure proceeding before the Clerk of Superior Court of Warren County."  Mr. Davis testified that Mr. Thompson did not represent him with respect to the foreclosure, but he did not explain where he obtained the standard default form language, where he obtained the information regarding "North Carolina General Statute § 45-21.16(c) as amended" or how he came to understand that the foreclosure would be held by the Clerk of Superior Court of Warren County.

In addition, the default letter of November 14, 2003, advises Ms. Davis that the principal amount due was $125,912, together with expenses of $4,443.  The testimony established that the expenses related to items completed by Millennium that would have been the subject of change orders, had Ms. Davis signed them.  The letter then says that Ms. Davis can avoid foreclosure by paying the principal, expenses, and per diem interest.  The letter does not give Ms. Davis a time by which those amounts had to be paid, and the reference to per diem is a mistake (as is the reference to a loan) since no interest is provided in the note.

The same day as the default letter, Mr. Thompson sent Ms. Davis a letter enclosing Millennium's letter and advising her that

11

as the trustee under the note and deed of trust, he had been requested to proceed with foreclosure and would commence foreclosure on December 15, 2003.  Pl. Ex. 14.

On January 9, 2004, Ms. Davis wrote a letter to the North Carolina Attorney General asking whether a contractor can sell a flooded house as new, and advising of her concerns about the threatened foreclosure.  Pl. Ex. 17.  (This letter will be discussed later in this opinion with respect to the response to the letter filed by Mr. Thompson).

On January 12, 2004, Ms. Davis again wrote to Mr. Davis and advised that the house had been flooded and was "not NEW," and that when he provided her with a new house as agreed, she would be glad to close.  Pl. Ex. 15.  Ms. Davis also consulted an attorney, Nick Long, about closing the loan.  When she determined that Millennium was not going to repair the house as she requested, Ms. Davis asked Mr. Long to represent her with respect to the damages caused by Millennium.  Mr. Davis, Ms. Davis and Mr. Long made a walk-through inspection of the house and Mr. Long proposed that there could be a closing by January 27, 2004.  Ms. Davis, however, did not believe the mildew issue had been addressed sufficiently and was unwilling to close until that problem was corrected to her satisfaction.  She was not satisfied with Mr. Long's representation, and she terminated his employment.

At this point Ms. Davis and Millennium appeared to be at an impasse.  From Ms. Davis' perspective, the house had been damaged by water during the storm and mold and mildew had already formed.

Photographs taken on October 8, 2003, showed that there was significant mildew in the master bedroom.[1]  Pl. Ex. 27.  Ms. Davis, who suffers from Crohn's Disease and has other medical conditions, previously had a problem with mildew at another residence, and she was insistent that the mold problem be corrected.  She was not at all unreasonable in her demand.

From Millennium's perspective, it believed that it had done all that was required under the purchase contract.  Millennium acknowledges that there had been some water damage, but its position is that any damage had been repaired.  Mr. Davis was told by Millennium's subcontractor that the wet insulation had been replaced and Mr. Davis inspected the home and could find no damage.  Additionally, the house had been appraised by Mr. Reilly, Mr. Wiggins (Millennium's inspector) found no problems, and the Warren County Housing Inspector had inspected the property and issued a Certificate of Occupancy.  Additionally, Millennium believed that Ms. Davis was making other demands, such as landscaping, different countertops, and a second frost-free faucet, that were not called for under the contract.

The court finds that with respect to the numbered items listed in Ms. Davis' letters of October 3 and October 22, 2003, those items were not required by the contract.  However, the court also finds that Millennium had not corrected the serious mold and mildew problem.  It is true that the house had been appraised, and

---

[1] Ms. Davis, her son Alton Davis and her friend Iris Richardson also testified regarding the presence of mold and mildew.

inspected by Mr. Wiggins and by the Warren County Housing Inspector, but those inspections did not include an inspection of the insulation within the home's walls.  Given the level of the mold and mildew reflected in the photographs of October 8, 2003, Ms. Davis was entitled to insist that a more complete inspection be made, and she was not required to purchase the modular home until the mold and mildew problem was resolved to her satisfaction.

There were several ways in which the disagreement between Ms. Davis and Millennium could have been solved.  The matter could have been mediated, submitted to arbitration or resolved through litigation.  Millennium chose not to resolve the dispute by any of those means.  Instead, it chose to foreclose under the deed of trust.  The problem, of course, is that no amount was owing under the deed of trust and Millennium was not entitled to foreclose.  Even assuming that a debt was owed, under the terms of the note, the note was not due and payable.  Clearly, Millennium had no right to foreclose.  Once the foreclosure was commenced, Ms. Davis lost her loan commitment, lost a $5,000 grant that she had been given by Haliwa-Saponi Indian Tribe, Inc. and lost her ability to purchase the modular home.

Millennium contracted to provide a new modular home to Ms. Davis, not one that had a mold and mildew problem.  Ms. Davis was reasonable in insisting that the mold and mildew problem be addressed to her satisfaction, and when Millennium refused to do so, it breached the contract to sell her a new modular home.  The problem could have been resolved, but by initiating the unwarranted

14

foreclosure, Millennium prevented Ms. Davis from closing.   The letter threatening foreclosure and the foreclosure itself violated North Carolina's Fair Debt Collection Practices Act and consequently was an unfair and deceptive trade practice under the North Carolina Unfair and Deceptive Trade Practices Act.

Mr. Thompson filed a foreclosure action in Warren County, Case No. 04 SP 015, in February 2004.[2]  The first foreclosure hearing took place on May 12, 2004, and was continued to June 25, 2004. The clerk of court, Richard Hunter, testified that Ms. Davis indicated at the hearing that she owned the land, was unable to get insurance on the house, and that she had paid taxes on the real property but not for the house because she felt she did not own the house.   Mr. Hunter was prepared to rule at the hearing in June 2004, but he did not reduce his findings to writing before going on vacation the following week.   When he returned, Mr. Thompson had filed a voluntary dismissal of the foreclosure proceeding.   Mr. Hunter testified that although under the terms of the note, the note was not yet due, his order would have allowed the foreclosure based on the failure to maintain insurance and to pay taxes.   At the trial he conceded that such a ruling would have been incorrect because the notice of default was for failure to make payments and not for the insurance and tax problems.

---

[2] The parties did not provide the court with copies of the foreclosure documents, and the witnesses were uncertain of the dates.  Mr. Thompson testified that he filed the first foreclosure proceeding in February 2004, and the court assumes this date is correct.

While the foreclosure was pending, Ms. Davis, through her attorney, hired Robert B. Rowley to inspect the home. Mr. Rowley inspected the home on May 8, 2004, and issued a letter to Ms. Davis on May 10, 2004. Mil. Ex. 2. The letter indicated that "[o]bserving the structure components in the crawl space does not indicate water infiltration or damage. Interior section of walls could not be observed." Mr. Rowley concluded that the observed areas showed "NO structural damage." Apparently Ms. Davis did not receive the letter of May 10, 2004, because on July 16, 2004, Ms. Davis wrote to Mr. Rowley to request a written inspection report. Pl. Ex. 19. Ms. Davis noted in the letter that Mr. Rowley found that the "marriage wall had separated from the Hurricane water damage," which Ms. Davis considered to be major structural damage. Ms. Davis received the report a couple of weeks later. Ms. Davis was not satisfied with the report because the inspection, like the other prior inspections, did not include inspection of the insulation behind the walls.

Also while the first foreclosure proceeding was pending, Mr. Hutchins and Premier Mortgage ended the loan process.[3] Though Ms. Davis' file indicates that it was closed at Ms. Davis' request, Mr. Hutchins testified that in fact the process ended because the property had gone into foreclosure, and that the FHA will not take a loan out of foreclosure. He testified that he made the notation

---

[3] There was no testimony as to the exact date that the loan approval was withdrawn, but Ms. Davis' letter to the North Carolina Fair Housing and Community Reinvestment dated May 18, 2004, refers to the fact that her file at Premier had been closed without her consent.

on the file indicating the application was withdrawn because he did not want the file to show that the credit was denied after the loan was approved.  Mr. Hutchins also testified that after the file was closed, Ms. Davis asked whether Premier could still broker financing for her, but, according to Mr. Hutchins, after the foreclosure was filed his hands were tied.

On August 23, 2004, a second foreclosure proceeding was filed in Warren County, Case No. 04 SP 085.  Presumably a notice was given to Ms. Davis, but it was not presented to the court.  Mr. Hunter testified that his notes from the foreclosure hearing on September 9, 2004, reflect that Mr. Davis testified at the hearing that he sent Ms. Davis a letter advising of her delinquency and of his intent to proceed with foreclosure.[4]  Further, Ms. Davis testified at the foreclosure hearing that the taxes were not yet due and that she was unable to obtain insurance on the house due to preexisting damage and the fact that she did not own the home.  Mr. Hunter entered an order on September 14, 2004, finding that Ms. Davis failed to keep the premises insured, which constituted a default under the terms of the note and deed of trust, and that Ms. Davis did not have a loan commitment and would be unable to pay the debt on its due date of September 12, 2004.  Thompson Ex. 1. Accordingly, Mr. Hunter authorized the trustee to notice and conduct a sale of the property.

---

[4] Again, since the letter was not provided to the court, there is no way for the court to know whether this notice advised that the basis for the foreclosure would be the failure to obtain insurance and failure to pay taxes, or a default in payments that were not yet due.

Ms. Davis appealed the Clerk's order, but she did not proceed with the appeal because she could not procure the required appeal bond to stay the sale.  To stop the foreclosure sale, Ms. Davis filed her chapter 13 petition on October 6, 2004.  As noted above, on March 2, 2005, Millennium filed a motion for relief from the automatic stay and objection to confirmation, and on April 4, 2005, Ms. Davis filed this adversary proceeding.  On June 7, 2005, Tarraspec Home Inspections conducted an inspection of the property and found a gap at the ends of vinyl siding where moisture damage could occur, broken roof shingles, exposed roof nails and lifted flashing that could lead to roof leaks.  Pl. Ex. 21.

On May 31 and June 7, 2005, Envirostat conducted a mold inspection of the property at 946 Hwy. 43, Macon, North Carolina and concluded that there was a continuing moisture problem, and "[c]onsidering these conditions and the high spore content the house is not safe for habitation until repair and clean up occur."  Pl. Ex. 22.  The primary source of the problem appeared to be the master bedroom and bathroom, which is the area in which Ms. Davis complained of mildew in October 2003.  In fact, the report indicates that "the wall cavity in the master bedroom gable wall . . . was found to have excessive moisture content . . . [and] is more than likely the source for the excessive mold spore counts found in the air sampling."  Pl. Ex. 22.  The Envirostat report, which was very thorough and convincing, validates Ms. Davis' legitimate concern that the mold and mildew had never been corrected.

18

**Breach of Contract**

Ms. Davis' first cause of action is for breach of contract. As previously mentioned, the court finds that Millennium breached its contract to sell the modular home by failing to provide a mold- and mildew-free home to Ms. Davis. Additionally, Millennium wrongfully commenced a foreclosure proceeding, which prevented Ms. Davis from obtaining the funding she needed to close on the house. The purchase contract did not provide for the note and deed of trust that were executed. Furthermore, the express terms of the deed of trust did not authorize Millennium to foreclose in the circumstances in which the foreclosure was commenced.

Ms. Davis demanded a number of items that were not provided in the contract, but her primary demand that she receive assurance that the mold and mildew problem had been solved was a legitimate demand that was never addressed. Mr. Davis relied on his subcontractor and his inspectors, who told him that the hurricane damage had been repaired. The parties believed their positions were warranted. These differences should have been resolved, but Millennium's choice to proceed directly to foreclosure precluded any resolution and made performance by Ms. Davis impossible.

**Breach of Warranty**

Ms. Davis' second cause of action is for breach of express and implied warranties. Because the closing on the modular home never took place, no warranty transferred, and the plaintiff may not prevail on her breach of warranty claims.

19

**North Carolina Manufactured Home Warranties Act**

The third claim for relief is for violations of the North Carolina Manufactured Home Warranties Act. As noted above, because no closing occurred, no warranties ever transferred. Accordingly, Ms. Davis may not prevail on her statutory warranty claims.

**Misrepresentation**

The plaintiff's fifth claim for relief alleges that Millennium engaged in misrepresentations to induce Ms. Davis to purchase the modular home. There was no evidence that Mr. Davis or any other representative of Millennium made any misrepresentations to Ms. Davis to induce her to enter into the purchase contract. Millennium did misrepresent its right to foreclose the deed of trust, but that misrepresentation is included in Ms. Davis' claim under the North Carolina Fair Debt Collection Practices Act and the North Carolina Unfair and Deceptive Trade Practices Act. Accordingly, Ms. Davis may not prevail on her claim of misrepresentation.

**Negligence**

Ms. Davis' sixth claim for relief is for negligence. Ms. Davis' complaint alleges that Millennium failed to exercise due care in the transportation, delivery and setup of the home. No evidence of negligence was presented at trial, and the court finds that Millennium was not negligent with respect to the transportation, delivery and setup of the home.

**North Carolina Unfair Debt Collection Act**

North Carolina General Statute § 75-54 prohibits a debt collector from collecting or attempting to collect a debt by any fraudulent, deceptive or misleading representation.  According to the statute, such representations include

> (4) Falsely representing the character, extent or amount of a debt against a consumer or of its status in any legal proceeding; . . . or falsely representing the creditor's rights or intentions.

N.C. Gen. Stat. § 75-54(4).

On November 14, 2003, Mr. Davis sent Ms. Davis a letter indicating that she was "in default in [her] note payments," that the amount of principal due was $125,912, that Millennium intended to commence a foreclosure, and that to avoid the foreclosure, Ms. Davis was required to pay $125,912 plus expenses of $4,443.  Pl. Ex. 14.  At that time, there was no debt due, and the letter was a false representation of the character, extent or amount of a debt. In fact, based on the documents actually executed and the fact that there never was a closing, there was no amount ever due under the note and no amount secured by the deed of trust.  See supra at 4-5. Furthermore, even if an amount was owed under the note and deed of trust, there was no right to foreclose, as there was no default, and the letter falsely represented Millennium's rights.

Similarly, if the second notice of intent to foreclose was sent to Ms. Davis, it too would have violated the statute because there was no amount due under the note and deed of trust.   The court finds that the demand letter of November 14, 2003, was a

21

violation of the § 75-54(4) of the North Carolina Fair Debt Collection Practices Act.

**Unfair and Deceptive Trade Practices**

Ms. Davis' fourth cause of action is for violations of North Carolina's Unfair and Deceptive Trade Practices Act. The court finds that Millennium committed unfair and deceptive trade practices in two respects.

The Unfair Debt Collection Act, § 75-56, provides that "[t]he specific and general provisions of this Article shall exclusively constitute the unfair or deceptive acts or practices proscribed by G.S. 75-1.1 in the area of commerce regulated by this Article." Accordingly, the finding that Millennium violated § 75-54(4) is necessarily followed by a finding that Millennium violated § 75-1.1. Additionally, Millennium's breach of contract together with its wrongful foreclosure form the basis of a separate unfair and deceptive trade practice.

Section 75-1.1 provides that "unfair or deceptive acts or practices in or affecting commerce[] are declared unlawful." N.C. Gen. Stat. § 75-1.1.

> [I]t was the clear intention of the 1969 General Assembly in enacting Ch. 833, among other things, to declare deceptive acts or practices in the conduct of any trade or commerce in North Carolina unlawful, to provide civil means to maintain ethical standards of dealings between persons engaged in business and the consuming public within this State, and to enable a person injured by deceptive acts or practices to recover treble damages from a wrongdoer.

22

Hardy v. Toler, 24 N.C. App. 625, 630-631, 211 S.E.2d 809, modified on other grounds, 288 N.C. 303, 218 S.E.2d 342 (1975) (emphasis added).

Ms. Davis and Millennium had a dispute about the habitability of the modular home.  To force Ms. Davis to accept and to pay for the house without resolving the dispute, Millennium instituted a wrongful foreclosure action, which threatened not only the modular home but Ms. Davis' otherwise unencumbered real property. Millennium made this decision despite having no right to foreclose, and it pursued this course of action to force Ms. Davis to accept a home that does not meet the standards required by the purchase contract.  This violates the ethical standards between businesses and the consuming public that the legislature intended to preserve with its enactment of the statute.

Generally speaking, a mere breach of contract, even if intentional, is not sufficiently unfair or deceptive to sustain an action under the statute.  Broussard v. Meineke Discount Muffler Shops, Inc., 155 F.3d 331 (4th Cir. 1998).  North Carolina courts relegate "claims regarding the existence of an agreement, the terms contained in an agreement, and the interpretation of an agreement to the arena of contract law."  Broussard at 347 (citation omitted).  However, a breach of contract with substantial aggravating circumstances can violate the statute.  Baldine v. Furniture Comfort Corp., 956 F. Supp. 580 (M.D.N.C. 1996).  Here the aggravating circumstance, wrongful foreclosure of a deed of trust not contemplated by or consistent with the purchase

agreement, together with the breach of contract, constitutes a violation of the North Carolina Unfair Deceptive Trade Practices Act.

**Breach of Fiduciary Duty by Defendant Thompson**

Ms. Davis' final cause of action is for breach of fiduciary duty by Mr. Thompson, who was the trustee under the deed of trust. A trustee under a deed of trust "is charged with the duty of fidelity as well as impartiality, of good faith and every requisite degree of diligence . . . ." and is bound "to attend equally to the interest of the debtor and the creditor alike . . . ." Mills v. Mutual Building & Loan Ass'n, 216 N.C. 664, 6 S.E.2d 549, 552 (1940) (internal citations omitted); see also N.C. Gen. Stat. §§ 45-4 et seq. (outlining procedure to be followed for trustee's execution of power of sale). The trustee's position is "predicated upon the theory that the trustee is a disinterested third party acting as agent both of the debtor and of the creditor, thus removing any opportunity for oppression by the creditor and assuring fair treatment to the debtor." Mills, 6 S.E.2d at 552, quoted in Matter of McDuffie, 114 N.C. App. 86, 88, 440 S.E.2d 865, 866 (1994). The "measure of the trustee's duty" is, as an agent of the debtor and the creditor, the "duty of fidelity, as well as impartiality; of good faith and every requisite degree of diligence . . . ." Davenport v. Vaughn, 193 N.C. 646, 137 S.E.2d 714, 715-16 (1927) (trustee's foreclosure of deed of trust was marked by "haste, imprudence, or want of diligence" and advanced interest of

24

one person to the injury of another, rendering him personally liable to injured party).

The trustee is required to act in good faith and, according to "the rule stated in Mills," to "exercise the judgment of a reasonable and prudent person in determining [whether] there had been default under the deed of trust." Furst v. Loftin, 29 N.C. App. 248, 224 S.E.2d 641, 646 (1976), overruled on other grounds, Connolly v. Potts, 62 N.C. App. 300, 302 S.E.2d 481 (1983). There is a fundamental duty to inquire into the relevant facts. See Smith v. Martin, 124 N.C. App. 592, 478 S.E.2d 228 (1996) (affirming grant of summary judgment against trustee for breach of duty because trustee was "bound to inquire" whether a debt was satisfied before cancelling the corresponding deed of trust, but did not, to plaintiffs' detriment).

In this case, Mr. Thompson failed to undertake the most basic of inquiries to establish whether there was a legitimate basis upon which to initiate a foreclosure. Had he made even a cursory investigation, Mr. Thompson would have discovered that no basis existed as of November 14, 2003, to foreclose. Mr. Thompson knew that Mr. Davis wanted to foreclose because Mr. Davis believed Ms. Davis was not going to consummate the purchase of the home. A simple reading of the note and deed of trust, which Mr. Thompson himself had prepared, would have revealed that there was no right to foreclose, because no debt was due. The court finds that Mr. Thompson breached his duty as trustee by proceeding with

foreclosure when it was apparent that no grounds for foreclosure existed.

Mr. Thompson also failed to act as an impartial and disinterested third party. The cases uniformly recite that the "the trustee in a deed of trust owes a duty to the debtor as well as to the creditor." _Furst_, 224 S.E.2d at 646; _see also_, _e.g._, _Swindell v. Overton_, 310 N.C. 707, 712, 314 S.E.2d 512, 516 (1984) (trustee to use "every requisite degree of diligence in conducting the sale and to attend equally to the interest of the debtor and creditor alike"). It is "especially important" that the trustee "resist the temptation to become a legal advocate," because "a trustee/attorney cannot ethically represent either the lender or the borrower as an advocate at any state of the foreclosure by sale process." 1 _Webster's Real Estate Law in North Carolina_, James A. Webster, Jr. ¶ 13-31(a) (5th ed. 1999) (citing CPR 166 (July 14, 1978)).

Although there was testimony from Mr. Thompson, Mr. Davis, Mr. Hunter (the Clerk of Court) and Marvin Rooker (Millennium's attorney in the second foreclosure proceeding) that Mr. Thompson was not representing the interests of Millennium in connection with the foreclosure, there is also convincing evidence to the contrary.

For example, in response to Ms. Davis' letter to Millennium on January 12, 2004, Pl. Ex. 15, Mr. Davis wrote Ms. Davis asking her to send all future correspondence "directly to our attorney, Mr.

Lewis A. Thompson."[5]   The letter was copied to Mr. Thompson, and there is no evidence that Mr. Thompson attempted to advise either Mr. Davis or Ms. Davis that he did not represent Millennium and that any correspondence related to this dispute should not be directed to him.

Also, on January 9, 2004, before the foreclosure action was actually filed but well after Mr. Thompson sent the notice of his intent to begin foreclosure proceedings, Ms. Davis wrote to the North Carolina Attorney General regarding her experience with Millennium.   Curiously, the response to the letter came not from Millennium, but from Mr. Thompson.   According to Mr. Thompson, the Attorney General's office contacted him to inquire about the situation, and Mr. Thompson responded in writing on February 23, 2004.[6]   Though Ms. Davis's complaint addressed the damages to the home, Mr. Thompson wrote, "From my perspective, this is a rather straightforward foreclosure procedure.   Millennium Development has afforded Ms. Davis every opportunity to resolve this obligation and she has failed to do so."   Mr. Thompson then provided that he could be contacted with respect to any questions.   This letter was copied to Millennium, but not to Ms. Davis.   It was sent to Ms. Davis by

---

[5]Mr. Davis' letter was not admitted into evidence at trial, but was attached to the Affidavit of Hester Alice Davis in Opposition to Thompson's Motion for Summary Judgment, Exhibit 2, and Mr. Davis testified about the letter at trial.

[6] Though the letter from Mr. Thompson to the Department of Justice was not admitted into evidence at the trial, it was attached to the Affidavit of Hester Alice Davis in Opposition to Thompson's Motion for Summary Judgment, Exhibit 4, and Mr. Thompson did testify about the contents of the letter at trial.

the Department of Justice as Millennium's response to her complaint.

Furthermore, when the first foreclosure action was dismissed, Mr. Thompson signed the stipulation of dismissal as "Attorney for Millennium." Mr. Thompson contends that this was merely a scrivener's error and that may be so. Nevertheless, it is one more indication of Mr. Thompson's inattention to his role as impartial trustee. At a minimum, Mr. Thompson's actions demonstrated an indifference to the rights of Ms. Davis, and the court finds that indifference is a breach of his fiduciary duty as trustee.

**Damages for Breach of Contract**

Ms. Davis maintains that Millennium's breach of contract and the wrongful foreclosure caused her great stress, emotional distress, and sleeplessness that led to medical complications. There is no doubt that this entire episode has been upsetting to Ms. Davis, but it is difficult to put a monetary value on those effects. Ms. Davis suffers from Crohn's disease, which is a condition aggravated by stress. However, there is no evidence before the court that substantiates the extent or cost of Ms. Davis' medical problems.

Ms. Davis contends that her credit rating suffered as a result of the foreclosure and because of her chapter 13 bankruptcy petition. While there can be no doubt that a foreclosure has the effect of lowering a person's credit rating, there is no evidence before the court as to the specific monetary damages Ms. Davis suffered as a result of her diminished credit standing. There is

also no doubt that a bankruptcy petition can be detrimental to one's credit rating, but in this case Ms. Davis' petition was a voluntary petition that she chose to file, and Millennium should not be held responsible for the consequences that flow from that voluntary decision. Ms. Davis could have pursued an appeal of the foreclosure order, and although she may not have been able to stop the sale without posting a bond, she would have been compensated for her loss if she ultimately prevailed. Hopefully, this memorandum opinion, which makes it clear that the foreclosure was wrongfully commenced by Millennium and the trustee, will remove the foreclosure from Ms. Davis' record and improve her credit standing. The court will not award damages based on the cost of her voluntary bankruptcy or for the consequences that flow from her voluntary bankruptcy petition.

Ms. Davis argues that Millennium should compensate her for the additional living expenses she incurred by not being able to move into the home that was the subject of the purchase contract with Millennium. According to Ms. Davis, by not moving into the new home, her family was separated, she had to live temporarily with her sister and later incurred rent of $350 per month. The sums she paid for rent and utilities, food and other living expenses are not the responsibility of Millennium. It may very well be that her expenses were higher as a result of not moving into the new home, but that has not been established by the evidence before the court.

According to Ms. Davis, when her loan commitment was terminated, she lost the ability to obtain credit at the rate of

6.25 percent and in the future will have to pay a rate of from 8 to 8.25 percent for a home loan. Other than Ms. Davis' testimony, there is no other evidence on this subject. There is no evidence of the rate that she was to receive from Premier Mortgage and no evidence concerning the current prevailing market rate. If the 8 to 8.25 percent rate she refers to is based on her diminished credit standing, hopefully the court's determination that the foreclosure that led to her bankruptcy was wrongful will help her get a better rate. In any event, there is not sufficient evidence to support damages based upon her inability to obtain credit at a lower rate.

The court will also not award damages for expenses Ms. Davis incurred for clearing her lot or for moving her trailer. These items were not the responsibility of Millennium under the purchase contract and are not damages that were incurred as a result of Millennium's breach of the purchase contract. The court notes that, in fact, Millennium incurred several expenses for services that were not required by the purchase contract. Specifically, in order to satisfy the requirements of Ms. Davis' FHA lender, Millennium incurred expenses of over $4,000 for landscaping, water testing, and driveway work that were not provided for in the purchase agreement. It is not known to what extent Ms. Davis benefitted from these extra services, but in view of Millennium's conduct in breaching the purchase agreement, no reimbursement by Ms. Davis is required.

Although most of the damages claimed by Ms. Davis have not been proven, there are three items for which Ms. Davis is entitled to compensation by Millennium, (1) $5,000 for the loss of a grant from the Haliwa-Saponi Indian Tribe for a down payment on the home, (2) $500 paid to her closing attorney Nick Long, and (3) $300 paid to home inspector Robert B. Rowley.    Millennium's wrongful foreclosure caused Ms. Davis to lose her loan commitment and to make the purchase of the home impossible.    Since she could not close the transaction, she lost the $5,000 grant as well as the benefit of the attorney services for which she had paid Mr. Long. Millennium's failure to provide a mold- and mildew-free home also caused her to expend $300 for a home inspector.

**Damages for Unfair Debt Collection**

North Carolina General Statute § 75-56 provides for a maximum penalty of $2,000 for violations of the Unfair Debt Collection Act. The facts of this case warrant the maximum allowable.    Mr. Davis and Millennium may have thought that the note and deed of trust were valid, but the terms of the note and deed of trust clearly show that the loan was not due and foreclosure was not justified. The wrongful use of a foreclosure to coerce Ms. Davis to purchase the modular home warrants the maximum penalty of $2,000.

**Damages for Unfair and Deceptive Trade Practices**

There were two unfair and deceptive trade practices perpetrated by Millennium.    The first was the threatened foreclosure that has been dealt with by assessing damages of $2,000 for unfair debt collection.    The second unfair and deceptive trade

31

practice is the breach of contract which was exacerbated by the wrongful foreclosure of a deed of trust not contemplated by or consistent with the purchase agreement. For this aggravated breach of contract the appropriate sanction, pursuant to North Carolina General Statute § 75-16, is the trebling of the compensatory damages of $5,800. The trebled damages are $17,400.

**Attorney's Fees**

Both the Fair Debt Collection Practices Act and the Unfair and Deceptive Trade Practices Act provide that the successful party is entitled to recover attorney's fees. N.C. Gen. Stat. § 75-16. Counsel for Ms. Davis stated that she would file a motion regarding her fees. Counsel shall have 5 days from the date of this order to provide an affidavit to the court setting forth her fees, and the court will determine the amount of the fees after reviewing counsel's submission.

**Damages for Breach of Fiduciary Duty**

As a direct result of Mr. Thompson's breach of his fiduciary duty and the wrongful foreclosure, Ms. Davis lost her loan commitment, lost the ability to purchase her home, lost the $5,000 down payment grant, and lost the benefit of the $500 she paid to her closing attorney. Additionally, as previously noted, the wrongful foreclosure caused her great stress, emotional distress, sleeplessness, and injury to her credit rating. However, Ms. Davis did not establish the amount of her loss with respect to those consequences of Mr. Thompson's actions.

Although the court finds Mr. Thompson's conduct to be as egregious as that of Millennium and Mr. Davis, the plaintiff has not sought to have the damages trebled with respect to Mr. Thompson, and therefore the damages for which he is liable will be $5,500.

Mr. Thompson is also liable for the attorney's fees that Ms. Davis incurred in her adversary proceeding against Millennium and Mr. Davis. To rectify and mitigate the effects of the wrongful foreclosure brought by Mr. Thompson, Ms. Davis incurred legal fees to bring this adversary proceeding against Millennium. These costs were a direct result of Mr. Thompson's breach of his fiduciary duty, and Mr. Thompson shall be liable to Ms. Davis for the attorney's fees related to the action against Millennium as determined by the court after reviewing the affidavit submitted by counsel for Ms. Davis. See Smith v. Martin, 124 N.C. App. 592, 478 S.E.2d 228 (1996).

Mr. Thompson's liability in the amount of $5,500 plus Ms. Davis' attorney's fees to be determined by the court, shall be joint and several with Millennium.

**Removal of Modular Home**

Millennium is entitled to remove the modular home provided that it first pays to Ms. Davis the amount of the damages and attorney's fees awarded, and agrees to indemnify Ms. Davis for any harm to the property that may result from the removal.

If Millennium wishes to remove the home, it must do so within 60 days from the date of this order. Additionally, at the option

33

of Ms. Davis, Millennium shall leave the concrete foundation or, if requested by Ms. Davis, shall remove the concrete foundation and return the property to the condition it was in before the home was delivered in October 2003.

For the reasons stated herein, Millennium's motion for relief from the automatic stay is **DENIED,** and its objection to confirmation of the plan is **DENIED**. Ms. Davis' objection to Millennium's claim is **ALLOWED**, and the deed of trust is determined to be **VOID** and shall be cancelled of record.

A separate judgment will be entered consistent with this memorandum opinion after the amount of the attorney's fees has been determined.

**SO ORDERED.**

DATED:   MAR **3 1** 2006

A. Thomas Small
Bankruptcy Judge

34